IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| BAY MACHINERY SERVICES, INC., | * | |
| | * | |
| Plaintiff, | * | |
| vs. | * | No. 4:08cv00368 SWW |
| | * | |
| | * | |
| CODAN FORSIKRING A/S, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| CODAN FORSIKRING A/S, | * | |
| | * | |
| Counter-Plaintiff, | * | |
| vs. | * | |
| | * | |
| | * | |
| BAY MACHINERY SERVICES, INC., | * | |
| | * | |
| Counter-Defendant. | * | |

CONSOLIDATED WITH

| | | |
|---|---|---|
| CODAN FORSIKRING, A/S, | * | |
| | * | |
| Plaintiff, | * | |
| vs. | * | No. 4:09cv00246 SWW |
| | * | |
| | * | |
| ATS LOGISTICS SERVICES, INC., | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM AND ORDER

This consolidated action arises out of damages sustained to the nacelle component of a

wind turbine in a motor vehicle accident on November 21, 2004, during the domestic, inland

portion of an international, multimodal shipment from Granaa, Denmark to a wind farm project,

known as the "Crescent Ridge Project," in Tiskalaw, Illinois.  Numerous issues are involved,

including the threshold issue of whether the inland carriage of the nacelle is governed by the Carriage of Goods by Sea Act (COGSA), note following 46 U.S.C. § 30701, or by the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706.  The matter was tried to the Court beginning on January 18, 2011.  This Memorandum and Order constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).[1]

## I.

In June 2004, NEG Micon USA, Inc. entered into a contract with Crescent Ridge LLC to erect a wind-powered electric generation facility in Tiskilwa, Illinois.  Ex. 31.  NEG Micon USA, Inc. is the American office of NEG Micon A/S, a Denmark entity.  Around the time of the contract between NEG Micon USA, Inc. and Crescent Ridge LLC, NEG Micon A/S was in the midst of a merger with Vestas Wind Systems A/S, also a Denmark entity and whose American office is Vestas-American Wind Technology, Inc. ("Vestas").   Vestas Wind Systems A/S ultimately acquired NEG Micon A/S and Vestas thereupon succeeded to the interest of NEG Micon USA, Inc.

The nacelle that is the subject of this action was manufactured in Denmark and was owned by Vestas.[2]  Vestas contracted with DFDS Transport A/S ("DFDS"), a transportation entity in Denmark, to transport the nacelle from Denmark to the United States.  DFDS thereupon issued a Combined Transport Sea Waybill No. NEGUSA-0216 (the "DFDS bill of lading") for

---

[1] This Memorandum and Order was prepared without benefit of a certified transcript of the proceedings.

[2] The nacelle is the part of a wind turbine that contains the generation and control equipment.  The turbine blades are attached to a hub, which in turn is attached to the nacelle, and the nacelle itself sits atop the tower section of a wind turbine.  The nacelle at issue weighed approximately 112,000 pounds.

the nacelle's transport.  Ex. 11.[3]  The DFDS bill of lading identifies the "Port of loading" as Grenaa, Denmark, and the "Port of discharge" as Beaumont, Texas.  The nacelle departed from Grenaa on October 27, 2004 on the ocean vessel BBC Japan.

Approximately one month prior to the nacelle's transport from Denmark, Vestas issued a "Notice of Contract Award for the Crescent Ridge Project" to Anderson Trucking Services, Inc. ("ATS") for the transportation or arranging for transportation of Vestas's wind turbine components, including the nacelle, from arrival ports in North America to the Crescent Ridge Project in Illinois.  *See* Ex. 9.  This Notice of Contract Award, dated September 24, 2004, was sent to representatives of two other companies related to ATS – ATS Logistics Services, Inc. ("ATS Logistics"), a logistics company, and ATS Specialized, Inc. ("ATS Specialized"), a motor carrier (collectively, the "ATS Organization").

Apparently, when ATS was awarded the contract for the Crescent Ridge Project, the actual contracting party was, or was going to become, ATS Logistics.  Valerie Johnson Harris, the Transportation Manger at Vestas and the person responsible for awarding the contract to ATS,[4] testified that she was never told that the actual contracting party was going to become ATS Logistics or that ATS Logistics was going to be taking over the contract and project.  Rather, she testified it was her understanding that the contracting party was ATS, namely their wind energy services division.  Harris testified, however, that she was aware of the existence of ATS Logistics and there is evidence in the record, including a letter of intent from ATS Logistics

---

[3] A waybill typically functions in the same way as a bill of lading, except that it is non-negotiable.  *Mitsui Sumitomo Ins. Co., Ltd. v. Evergreen Marine Corp.*, 621 F.3d 215, 217 n. 1 (2nd Cir. 2010) (per curiam) (citing *Royal & Sun Alliance, Ins., PLC v. Ocean World Lines, Inc.*, 612 F.3d 138, 142  n. 6 (2nd Cir. 2010)).  The document serves to acknowledge that the carrier has received the goods, and it operates as a contract for the carriage.  *Id.*

[4] At the time, Harris's last name was Johnson.  Harris left her employment with Vestas in December 2004.

and e-mail communications with individuals at ATS Logistics (Ex. 12), suggesting that at least some individuals at Vestas, if not Harris herself, were aware of ATS Logistics's involvement in the transportation of Vestas's wind turbine components to the Crescent Ridge Project.

In addition to the involvement of ATS Logistics, Jason Netland, ATS Logistics's Vice President, testified that ATS Specialized was going to haul a significant portion of the Crescent Wind Project, "maybe 25 percent of the total shipments." Netland testified that this meant "upwards of a million dollars worth of business" for ATS Specialized.

The agreement between Vestas and ATS/ATS Logistics is somewhat murky and is at the center of many of the disputed contentions among the parties. Harris entered into discussions with Alan Redding, Director of Sales for wind energy services for ATS Specialized, concerning the performance of carriage of wind turbine components to the Crescent Ridge Project. Redding was a key person for the ATS Organization's sales effort seeking Vestas's business and, according to Harris, was essentially her counterpart representing ATS on the Crescent Ridge Project. Harris testified that she was "soliciting for a turnkey transportation solution, which was all inclusive ... All of the components being hauled by a single carrier and the transportation service provider or trucking company in this case, was bidding on the opportunity to handle the entire project in its entirety." She testified she told Redding that she was "looking for carrier services provided by a company that owned and operated equipment and a carrier that had a strong safety rating, a carrier that had a proven track record of on time deliveries, [and] a carrier that would be willing to honor the pricing that was set forth and not come back later and ask for extra charges." Harris testified that Redding told her he could offer a company that owned its own equipment for the transportation and delivery of wind turbine components and that ATS

4

committed to providing the trucks and trailers and qualified drivers needed for the Crescent Ridge Project.

Certainly, Redding did not distinguish between ATS, ATS Logistics, and ATS Specialized in his dealings with Harris.  For example, Redding had previously represented to Harris in a June 2003 letter on ATS Specialized letterhead that "ATS has been very active in the past several years in the transport of wind tower projects," that "ATS" has "assisted Vestas in several projects that have required specialized transportation," that "ATS has expanded its heavy haul fleet to accommodate the increasing size of wind tower components," that "ATS can meet any specialized transportation and heavy lift requirement that Vestas may have," and that "ATS Specialized is a specialized heavy-haul carrier...."  Ex. 41.  In fact, Redding stated that it was ATS – his "group" – that was awarded the transportation contract from Vestas and that he informed Harris by e-mail dated November 16, 2004 (Ex. 13) that he had consensus on the contract and that the consensus to which he was referring would have had to be from someone "[w]ithin any ATS company."

Redding was not alone in his conflating of the companies comprising the ATS Organization.  Netland testified that the relationship Redding had with Harris "was advantageous to us to basically deputize him as the person that would continue communications from the Vestas side as the project came together" and that "that's sort of exactly how it all came together, so it was definitely cousins or brothers or whatever the sister companies we called it worked together to accomplish the final goal."

Likewise, Don Finnvik, who performed operations coordinating and sales for ATS Logistics, testified that

> [p]art of the tactic I used with John Hewitt [described variously as director of projects, project manager, vice president, and director of construction for NEG Micon USA] was I was going to rely on ATS specialized to supply me with some equipment and that was critical and they were going to be a carrier like everybody else but they had the equipment that I could go to them and say, look, I need help with this piece of equipment and there was a lot of discussion with respect to that and that was one -- they were one of the main pillars of the team that I put together... it's a sister company that I can plead my case to get them to work with me and for me in the project.

Finnvik testified that Redding "was very good at schmooze" and "was very good at being a salesman" and "convincing people that we could bring them service...."

In 2004, Redding traveled on several occasions to Vestas's headquarters in Portland, Oregon, to make sales calls on Harris.  Redding and Harris ultimately reached agreement on the carriage of Vestas's cargo to the Crescent Ridge Project site, and Vestas thereupon issued the "Notice of Contract Award for the Crescent Ridge Project" by letter dated September 24, 2004 addressed, at ATS, to Redding, Ed Myers, Director of Sales and Marketing at ATS Specialized, and Finnvik.  Ex. 9.

Harris testified that it was not Vestas's policy to use brokers for these specialized and highly valuable loads and that the sole reason ATS was awarded the contract was because they presented themselves as owning and controlling the specialized equipment needed to haul this project.  Harris testified she was happy that ATS provided a "turnkey" project and that Redding expressed that he "was very pleased to be participating with Vestas business on a full turnkey basis."

Christine Engel, Harris's administrative assistant, also stated that Vestas wanted carriers, not brokers, and that Vestas envisioned ATS using its own equipment:

> At the time, Vestas did not want their loads brokered, was what the understanding I had from Valerie, was that we wanted carriers that had their own equipment and

6

used those...[the understanding was] that there was no brokering of our loads allowed ... to give Vestas more control over the movement of loads and to lessen loss.

After awarding the transportation contract to ATS/ATS Logistics, and prior to motor carriage of any of Vestas's wind turbine components to the Crescent Ridge Project site, Vestas sent ATS/ATS Logistics a carriage contract template entitled "Vestas-American Wind Technology, Inc. Transportation of Wind Turbine Components Standard Terms and Conditions" (hereinafter the "First Carriage Contract").  Ex. 10.  This First Carriage Contract had a blank space in which the Carrier's name was to be inserted and provided in Clause 19 that "Carrier shall not subcontract the performance of any of its obligations under this Agreement unless it obtains the prior written approval of Vestas-American" and that "In any event Carrier shall remain responsible for the performance of all of its obligations under this Agreement notwithstanding any subcontract."  There is no evidence that this document was ever signed by any party.  Subsequently, pursuant to the agreement reached between Harris and Redding as referenced in the September 24th notice of contract award, but without any Carriage Contract being formally accepted or entered into, the first load of wind turbine generator components was picked up for carriage to the Crescent Ridge Project on October 22, 2004.  Between October 22, 2004 and November 19, 2004, a total of 192 trailer loads of wind turbine components had been carried pursuant to the agreement reached between Harris and Redding but without a formal Carriage Contract being accepted or entered into by Vestas and any company in the ATS Organization.  Harris testified, however, that the First Carriage Contract – at least "[t]he text in the body of the agreement" – is the only agreement memorializing the terms of the agreement or terms of the arrangement concerning the transportation of the wind turbine components to the

Crescent Ridge Project.  She testified that this was the document that she finalized and asked for a response from Redding in an e-mail on November 16, 2004.  Ex. 13.

On November 16, 2004, Redding, in response to Harris's e-mail message seeking a response, sent Harris an e-mail message proposing "a few modifications" to the First Carriage Contract.  Ex. 13.  This e-mail did not identify the entity that would be the "Carrier" under the First Carriage Contract.  One of the "modifications" proposed in Redding's e-mail to Harris was a limitation of the "Carrier's" maximum liability for loss of or damage to cargo "In any event" to "$100,000 per trailer used."  Redding's e-mail stated that he was "hopeful that this format will meet with your approval."  There is nothing in the record showing that Vestas expressly agreed to the limitation modification proposed in Redding's November 16, 2004 e-mail to Harris, and Harris testified that she never agreed to this modification.  Harris testified that she received this e-mail but that she did not respond to it as she "was traveling during this time frame and was busy with executing the project deliveries."  Redding stated he doesn't recall whether Harris agreed to the limitation.

On November 17, 2004, ATS Logistics signed, as "Carrier," a second version of the Carriage Contract (hereinafter the "Second Carriage Contract").  Ex. 14.  This Second Carriage Contract contains the $100,000-per-trailer-used limitation of liability proposed in Redding's November 16, 2004 e-mail to Harris and also provides in Clause 19 that "Carrier can subcontract the performance of any of its obligations under this Agreement" but that the "Carrier shall remain responsible for the performance of all of its obligations under this Agreement

notwithstanding any subcontract."[5]  Vestas, however, never signed this Second Carriage

Contract and states it has no record of receiving it.  ATS Logistics produced no documentary

evidence of ever sending to Vestas the Second Carriage Contract it signed.

In the meantime, the nacelle that is the subject of this action arrived at the Port of

Beaumont on November 15, 2004.  ATS Logistics was a party to a written contract apparently

dating from January 2003 with Bay Machinery Services, Inc. ("Bay Machinery"), a heavy-haul

motor carrier.  *See* Ex. 2.  The contract between ATS Logistics and Bay Machinery was entitled

"Broker/Carrier Agreement" (hereinafter "Subcontract") and was signed by Netland on January

24, 2003, and Hubert Kerton, Bay Machinery's owner and driver, on January 27, 2003.[6]  Vestas

was not a party to, and states it had no knowledge of, the subcontract between ATS Logistics and

Bay Machinery.  In any case, the nacelle load was assigned to Bay Machinery by virtue of a

Load Confirmation & Rate Agreement between ATS Logistics and Bay Machinery dated

November 11, 2004.  Ex. 21.  The Load Confirmation & Rate Agreement states, "A minimum of

$100,000 cargo insurance is required unless otherwise noted."  No notice of additional insurance

coverage was given to Bay Machinery.

The nacelle was in apparent good and undamaged condition upon its arrival at the Port of

Beaumont.  In this respect, Kerton signed a "Transport Control Form" on November 19, 2004,

---

[5] Clause 19 provides in full as follows: "Carrier can subcontract the performance of any of its obligations under this Agreement.  Carrier will disclose all partners to Vesta[s]-American.  In any event Carrier shall remain responsible for the performance of all of its obligations under this Agreement notwithstanding any subcontract."

[6] The first paragraph of the ATS Logistics-Bay Machinery subcontract states that it was entered into on November 23, 2004, which post-dates the accident, while the signature page is dated January 2003, which pre-dates the accident.  *See* Ex. 2.  This discrepancy was briefly noted during trial but the partes did not particularly address its ramification.  The Court notes that by facsimile dated November 23, 2004, ATS Logistics notified Bay Machinery that "[i]n reviewing our carrier files, we have discovered that we need an updated contract broker/carrier agreement from you."  Ex.'s 8, 37.  The need for an updated contract is not explained, although it may be that it was meant to coincide with a new agreement for the transportation of wind turbine components that was entered into on November 24, 2004, three days after the accident.  Ex. 26.

which stated *inter alia* that the nacelle had been "Received OK" by Bay Machinery on that date and that "The goods has [sic] been inspected and found to be in good order."  Ex. 1.

The nacelle was loaded onto Bay Machinery's trailer by a crew at the Port of Beaumont late Friday on November 19, 2004.  Kerton states that the loading of the nacelle on his trailer "wasn't perfect, but it was on there."  Kerton then secured the load onto his trailer by chaining it down – noting that he was always responsible for making sure that the load is safely secured prior to the beginning of the trip – and getting it ready for departure from the Port of Beaumont the following morning.  Kerton did not issue a bill of lading for the nacelle tendered to Bay Machinery.

Kerton departed from the Port of Beaumont on Saturday morning, November 20, 2004, and made it as far as Texarkana, Texas, where he spent the night.[7]  Kerton states that the following Sunday morning, November 21, 2004, he departed from Texarkana and stopped at Magnolia, Arkansas, where he refueled and conducted a load check, and then resumed his journey to Illinois.  Kerton states that on that Sunday afternoon, near the White River in Arkansas (between St. Charles and Marvell, Arkansas), he was traveling northeast on Arkansas 1 near the intersection of Arkansas 17, a two-lane highway, when the nacelle became disconnected from the trailer on which it was being transported, fell onto the ground, and suffered damages.[8]  Kerton states he was traveling about 50-55 miles per hour around a curve to the right when he noticed the trailer with the attached nacelle "was skidding across the road."  He states the nacelle "just drug the whole trailer, and it went down off of the shoulder ..., and then it rolled up on its

---

[7] Kerton noted that with the type of load he was carrying, he could only run daylight hours.

[8] The route Kerton was traveling was prescribed by the State of Arkansas in its permitting process.

10

side."  Kerton states that the nacelle ended up "off of the trailer in the dirt, and the trailer was

down off the shoulder, also."[9]

Following the accident, Engel notified ATS Logistics by letter dated November 22, 2004,

that it was Vestas's intention to hold ATS Logistics fully liable for all losses incurred as a result

of the transportation of the nacelle.  Ex. 16.[10]  Vestas's notice of liability letter certainly seems to

have increased ATS Logistics's awareness of the murky agreement for the transportation of wind

turbine components under which it was operating and the potential pitfalls of continuing as

before.  Indeed, shortly after the accident, Vestas (now represented by Mette Bulow) and ATS

Logistics formally entered into a revised Carriage Contract (hereinafter "Revised Carriage

Contract") on November 24, 2004, containing a $400,000 limitation of liability for carrying

nacelles.  Ex. 26.[11]  Netland testified that the Revised Carriage Contract followed Vestas's

notice of liability letter and was established quickly because *inter alia* ATS Logistics "had loads

on the road."  This Revised Carriage Contract was the only Carriage Contract which Vestas and

ATS Logistics both signed.  It post-dates the accident of November 21, 2004, and, thus, does not

---

[9] In an earlier deposition, Kerton stated that the trailer with the nacelle apparently still attached started to move to the left towards the center of the highway, crossed the center line, went onto the opposite shoulder, and then "dug into the soft dirt." He stated that at that point, the nacelle, which he "believe[s] was still attached to the trailer, "wanted to keep moving" and came off the trailer and went down the bank.  Kerton stated that he initially thought the nacelle simply slid off the trailer and "pulled the trailer over with the chains" but that he now believes that the trailer actually came apart "and the whole thing slid over."  He noted that the trailer was a modular trailer that comes apart in the back as well as the front and that "that's what I believe happened."  Kerton stated, however, that there was an escort and two trucks behind him but that they couldn't say what happened – "I asked them" and "[n]obody could say this, that, nothing..." (although he stated they noted that speed was not a factor) – and that an individual with the Department of Transportation inspected the accident scene and likewise "had no clue what happened any more than anybody else."

[10] The notice of claim letter was sent to ATS Logistics.  Harris testified that at this point, she still did not know that ATS Logistics was the responsible party and that she instructed Engel to notify ATS that Vestas would hold them fully responsible.  She states that it was Engel that provided the address for ATS Logistics.

[11] Clause 19 in the Revised Carriage Contract is identical to Clause 19 in the Second Carriage Contract which, as previously noted, provides that ATS Logistics can subcontract the performance of any of its obligations under the Agreement but that ATS Logistics "shall remain responsible for the performance of all of its obligations under this Agreement notwithstanding any subcontract."

govern the rights and liabilities of the parties with respect to the damage to the nacelle incurred on that date.

Codan Forsikring, A/S ("Codan"), a Denmark insurance entity, had insured Vestas against the risk of damage to the nacelle. Upon learning that the nacelle had been damaged, Dorrit Naesborg, Cargo Claims Manager at Codan, instructed W.K. Webster (Overseas), Ltd. ("Webster"), Codan's agent in the United States, to arrange a survey of the damaged nacelle. Webster, in turn, hired Crawford Marine & Transportation ("Crawford") to do the survey. Joseph Prata, Regional Marine Supervisor with Crawford, subsequently issued a report noting extensive damage to the nacelle. Ex. 28. Naesborg contacted Captain Poul Petersen, a Master Mariner and surveyor with Esbjerg Survey Association in Denmark, which he founded. Captain Petersen recommended that the nacelle be returned to Denmark for a further survey. Naesborg accepted Captain Petersen's recommendation and the nacelle was returned to Denmark by ocean transit.

Upon the nacelle's return to Denmark, Captain Petersen surveyed the damaged nacelle and concluded that while the nacelle itself was damaged beyond repair, certain parts of the nacelle could be salvaged. Subtracting the value of the parts that could be salvaged from the nacelle and factoring in costs associated with surveying the damage to the nacelle, Captain Petersen issued a report dated September 22, 2006, in which he concluded that the total claim for the damaged nacelle was Danish Kroner (DKK) 3,293,609.88 (over $606,000 in today's U.S. dollars). Ex. 29.

Naesborg testified that on May 31, 2006, in advance of Captain Petersen's report, Codan paid Vestas DKK 3,000,000 pursuant to its contract of insurance (having been informed by

Captain Petersen that the total claim would certainly exceed DKK 3,000,000), and that on November 1, 2006, following Captain Petersen's report, Codan paid Vestas the remaining amount due.  Codan states that the final amount paid to Vestas in connection with the damage to the nacelle totaled $606,917.30 in U.S. dollars.

With its insurance payment to Vestas, Codan became subrogated to Vestas's claims against Bay Machinery and ATS Logistics.  Codan states it demanded payment from Bay Machinery for damages to the nacelle but that Bay Machinery claims *inter alia* the action is governed by COGSA and that any claims against Bay Machinery related to the damage sustained to the nacelle are subject to limitations of carrier liability.  In this respect, Bay Machinery filed a declaratory judgment action (commencing this consolidated action) claiming *inter alia* that it is entitled to a determination as to the applicability of COGSA and its corresponding liability limitations.

Codan denies that COGSA applies in this situation and has counterclaimed against Bay Machinery for breach of contract of carriage regulated by the Carmack Amendment.  Codan additionally brings an action under the Carmack Amendment against ATS Logistics alleging that ATS Logistics arranged for Bay Machinery to pick up, receive, and accept the nacelle, that ATS Logistics agreed to transport and deliver the nacelle in good order and condition, and that ATS Logistics's failure to deliver the nacelle in good condition constitutes an actionable breach of its duties, causing Codan to sustain damages.  ATS Logistics denies liability under the Carmack Amendment, claiming *inter alia* that it was acting as a "broker" for Vestas, not as a "carrier," and therefore cannot be held liable for cargo loss and damage under the Carmack Amendment.

II.

13

In addition to the governing law, the parties raise issues that include (a) whether Codan's action is barred by limitations; (b) whether ATS Logistics is a "carrier" rather than a "broker" as defined by the Carmack Amendment; (c) whether the record establishes Codan's *prima facie* case of liability under the Carmack Amendment for damage to the nacelle; (d) whether ATS Logistics is entitled to a limitation of its liability for damage to the nacelle because the Second Carriage Contract (signed only by ATS Logistics) and the November 16, 2004 e-mail from Redding to Harris both included a limitation of liability of $100,000; and (e) whether Bay Machinery is entitled to a limitation of its liability for damage to the nacelle because Bay Machinery was to be given notice of the need for additional insurance in the event the value of the shipment exceeded $100,000 and no such notice was given.

## A.

The Court first turns to the issue of which federal statutory scheme governs the extent of the parties' liability: COGSA, which creates negligence-based liability with a damages cap, or the Carmack Amendment, which imposes something akin to strict liability. *Evergreen Marine*, 621 F.3d at 216. For the reasons that follow, the Court finds that the liability of the parties is governed by the Carmack Amendment and not by COGSA.[12]

### 1.

COGSA governs the terms of bills of lading issued by ocean carriers engaged in foreign trade. *Kawaski Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, — U.S. —, 130 S.Ct. 2433, 2440

---

[12] The Court announced this ruling, based on the parties' motions for summary judgment, in a telephone conference with the parties on January 12, 2011, which was reduced to an Order entered January 13, 2011 [doc.#108]. In that Order, the Court noted that it would elaborate on its ruling that this action is governed by the Carmack Amendment in its Findings of Fact and Conclusions of Law following trial. Because the Court ruled prior to trial on the basis of the parties' motions for summary judgment that the Carmack Amendment governs this action, the parties properly did not put on any evidence at trial concerning the issue of whether the Carmack Amendment or COGSA is the governing law.

(2010) (citing COGSA).  It requires each carrier to issue to the cargo owner a bill that contains

certain terms.  *Id*.  Although COGSA imposes some limitations on the parties' authority to adjust

liability, it does not limit the parties' ability to adopt forum-selection clauses.  *Id*.  By its terms,

COGSA only applies to shipments from United States ports to ports of foreign countries and vice

versa.  *Id*.  The statute, however, allows parties the option of extending certain COGSA terms by

contract to cover the entire period in which the goods would be under a carrier's responsibility,

including a period of inland transport.  *Id*. (citation and internal quotation marks and alterations

omitted).  Thus, the terms of a single "through" bill of lading can apply to the domestic part of

the import's journey by motor carrier.   A bill of lading records that a carrier has received goods

from the party that wishes to ship them, states the terms of carriage, and serves as evidence of

the contract for carriage.  *Id.* at 2439.  A "through" bill of lading covers both the ocean and

inland portions of the transport in a single document.  *Id.  See also American Road Service Co. v.

Consolidated Rail Corp.,* 348 F.3d 565, 568 (6th Cir. 2003) ( "A bill of lading issued in a foreign

country to govern a shipment throughout its transportation from abroad to its final destination in

the United States, is termed a 'through' bill of lading") (quoting *Capitol Converting Equip., Inc.

v. LEP Trans., Inc.,* 965 F.2d 391, 394 (7th Cir.1992)).  "Determining whether a shipment is

governed by a through bill of lading is a question of fact." *Id.*  Relevant to the inquiry are: (1)

whether the bill of lading indicates the final destination for the goods; (2) whether the freight for

the entire shipment was prepaid; and (3) whether a separate, domestic bill of lading was ever

issued.  *Custom Rubber Corp. v. ATS Specialized, Inc*., 633 F.Supp.2d 495, 504 (N.D.Ohio

2009).

2.

15

The Carmack Amendment, in turn, addresses the liability of motor carriers for cargo damaged in interstate motor carriage and provides, in pertinent part, as follows:

> A carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 or chapter 105 are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading and, except in the case of a freight forwarder, applies to property reconsigned or diverted under a tariff under section 13702. Failure to issue a receipt or bill of lading does not affect the liability of a carrier.

49 U.S.C. § 14706(a)(1).

The underlying purpose of the Carmack Amendment is to relieve cargo owners of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods, *Regal-Beloit*, — U.S. —, 130 S.Ct. at 2441, and to clarify the carrier's liability when damage occurs to a shipper's interstate shipment. *Travelers Ins. v. Panalpina Inc.*, No. 08 C 5864, 2010 WL 3894105, at *4 (N.D.Ill. Sept. 30, 2010) (internal quotation marks and citation omitted). The Carmack Amendment is intended to make shippers whole without a complex burden of proof, enable carriers to know and reasonably limit their risk under the circumstances at hand, and create uniformity and consistency in the valuation and disposition of interstate cargo claims. Wesley S. Chused, *The Evolution of Motor Carrier Liability under the Carmack Amendment into the 21st Century*, 36 Transp. L.J. 177, 210 (2009). *See also Molloy v. Allied Van Lines, Inc.*, 267 F.Supp.2d 1246, 1251-52 (M.D.Fla. 2003) (the Carmack Amendment intends *inter alia* to hold carriers responsible for damage they cause to

16

transported goods, to encourage payment of claims without litigation, and to facilitate prompt investigation of claims).

3.

The Court finds that the DFDS bill of lading is not a through bill of lading and, consequently, COGSA does not apply to the inland carriage of the nacelle from the Port of Beaumont to Illinois.  First, the DFDS bill of lading specifically names the "Port of discharge" of the nacelle as Beaumont, while the "Place of Receipt" and "Place of delivery" sections of the DFDS bill of lading are left blank.  Had the DFDS bill of lading intended to extend the transportation responsibility of DFDS inland from the Port of Beaumont or to its final destination, the "Place of Delivery" section of the bill of lading would have been filled in accordingly.  *See* Affidavit of Kenneth Witkowski, DFDS Director of Quality and Compliance, at ¶ 11.  *Accord Custom Rubber*, 633 F.Supp.2d at 504 (in finding that bill of lading was not a through bill of lading, court noted that the bill of lading lists "La Spezia" (in Italy) as the Port of Loading and "New York, NY" as the Port of Discharge and that "[s]ignificantly, the space under 'Place of Delivery' is left blank...").

It is further clear that the conduct of Vestas, DFDS, the ATS Organization, and Bay Machinery reflects a clear separation between the carriage of the nacelle by sea from Denmark to the Port of Beaumont under the DFDS bill of lading, and the subsequent domestic, inland carriage of the nacelle from the Port of Beaumont to Illinois by truck.  As previously noted, the DFDS bill of lading reflects that its carriage responsibility ended at the Port of Beaumont, while Vestas reached an agreement with ATS/ATS Logistics (albeit not a written agreement that was entered into before the accident) to transport wind turbine components, including the nacelle,

17

from arrival ports in North America to Illinois; DFDS was not a party to the Vestas-ATS/ATS

Logistics agreement.  ATS Logistics then subcontracted the inland carriage of the nacelle to Bay

Machinery.  *See* Ex. 2, ATS Logistics-Bay Machinery Subcontract; Ex. 21, Load Confirmation

& Rate Agreement.  In Clause 7 of the ATS Logistics-Bay Machinery subcontract, Bay

Machinery "assume[d] the liability required of an interstate motor common carrier under 49

U.S.C. 14706 [the Carmack Amendment], as amended, . . . Carrier's liability for the goods shall

be for 'Full actual loss' . . . " Ex. 2.  ATS Logistics and Bay Machinery did not specify in their

subcontract that Bay Machinery's liability would be governed or limited by COGSA.  The

conduct of Vestas, DFDS, the ATS Organization, and Bay Machinery with respect to the inland

carriage is inconsistent with a through bill of lading arrangement, under which DFDS would

have provided or arranged carriage of the nacelle all the way to its destination in Illinois.  *Cf.*

*Regal-Beloit*, – U.S. –, 130 S.Ct. at 2445 (in finding that COGSA can apply to the U.S.-

domestic, inland portion of international ocean cargo carriage – provided that the inland portion

of the carriage is performed under a "through" bill of lading – Supreme Court noted that "[t]his

would be a quite different case if ... the bills of lading for the overseas transport ended at this

country's ports and the cargo owners then contracted with Union Pacific [the domestic inland

carrier] to complete a new journey to an inland destination in the United States.  Under those

circumstances, Union Pacific would have been the receiving rail carrier and would have been

required to issue a separate Carmack-compliant bill of lading to the cargo owners").

Finally, Bay Machinery was to be paid by ATS Logistics, not by DFDS, to transport the

nacelle from the Port of Beaumont to Illinois.  *See* ATS Logistics-Bay Machinery Subcontract at

Clause 3.  The ATS Logistics-Bay Machinery subcontract further provided that "[Bay

Machinery] shall not seek recovery of any charges for Transportation Services from any entity other than [ATS Logistics]."  *See id.* at Clause 4.  These provisions of the ATS Logistics-Bay Machinery subcontract are inconsistent with any claim that Bay Machinery was a contractor or subcontractor of DFDS or otherwise entitled to invoke the terms of the DFDS bill of lading.

Bay Machinery, however, argues there is evidence from which a finder of fact could conclude that the shipment of the nacelle was intended to take place as a single shipment from Denmark to Illinois pursuant to a through bill of lading, including that the final destination of the nacelle is indicated on the DFDS bill of lading.  It is true that the DFDS bill of lading did, in the "Notify Party" section, name the delivery address for the goods as "Crescent Ridge Wind Farm Tiskalaw, IT 61356."[13]  This reference, however, appears to be for information purposes only; there is no indication that this reference was intended to extend the carriage responsibility of DFDS inland from the Port of Beaumont.  Witkowski Aff. ¶ 12.  Indeed, the DFDS bill of lading further contains a reference to the contract sale terms between buyer and seller as "C&F BEAUMONT," indicating that the shipper of the goods identified on the DFDS bill of lading was to arrange and pay for transportation to the Port of Beaumont, and not beyond.  Witkowski Aff. at ¶ 13.

Bay Machinery also notes that Vestas representative Mette Bulow testified that the shipment of the nacelle was to originate in Denmark and end at Illinois, and that Kerton did not issue an inland bill of lading upon the nacelle being tendered to him, thus evidencing that the DFDS bill of lading was a through bill of lading.  Bulow's testimony that the shipment of the nacelle was to end at Illinois is, of course, true, but this testimony does not address the reach of

---

[13] The reference to "Tiskalaw, IT" is obviously a typo and was meant to reference "Tiskalaw, IL."

the DFDS bill of lading.  Indeed, Bulow also testified that it was not her belief that maritime law

was meant to apply.  For his part, Kerton stated that because he obtained the nacelle at an ocean

port, he assumed that the ocean bill of lading applied as a through bill of lading and that he did

not need to issue an inland bill of lading.  Kerton Decl. at ¶ 4.  Just eight days earlier, however,

Bay Machinery issued an inland bill of lading for a nacelle destined for the same Illinois wind

farm project that was received at the Port of Beaumont.  Moreover, Bay Machinery's subcontract

with ATS Logistics required that Kerton issue a bill of lading for all cargo transported under that

subcontract, including the nacelle.  ATS Logistics-Bay Machinery Subcontract, at Clause 5(j).

Kerton's assumption concerning the reach of the DFDS bill of lading did not serve to alter its

terms, and Kerton's decision not to issue a bill of lading had no effect on the DFDS bill of lading

or, for that matter, on liability under the Carmack Amendment.  *See* 49 U.S.C. § 14706(a)(1)

("Failure to issue a receipt or bill of lading does not affect the liability of a carrier").[14]

In sum, the DFDS bill of lading is not a through bill of lading.  It did not provide for any

transportation from the Port of Beaumont and does not apply to the inland carriage of the nacelle

performed by Bay Machinery from the Port of Beaumont.  Accordingly, the Carmack

Amendment, not COGSA, applies to the inland carriage of the nacelle from the Port of

Beaumont to Illinois.[15]

B.

---

[14] Were it otherwise, DFDS, having contracted only to transport the nacelle to the Port of Beaumont, would be unknowingly exposed to liability for the domestic, inland transport of the nacelle simply because Kerton chose not to issue a bill of lading.

[15] The DFDS bill of lading contains a "Himalaya Clause," which extends to "persons whose services the Carrier has used in order to perform this Contract...."  Ex. 11, DFDS bill of lading, Clause 14(3).  *Accord Regal-Beloit*, – U.S. – , 130 S.Ct. at 2439 (a Himalaya Clause in bills of lading extends the bill's defenses and limitations on liability to parties that sign subcontracts to perform services contemplated by the bills).  Bay Machinery cannot avail itself of this Clause as it was not employed, contracted or used in any way by DFDS or any DFDS-related entity to perform any portion of the transportation of the nacelle from Denmark to Illinois.

The Court now addresses the contention by ATS Logistics that Codan's action is barred by limitations.  This contention was presented at the end of the trial on Thursday afternoon, January 20, 2011, and was based on correspondence between Leslie Orr on behalf of Webster (as previously noted Codan's agent in the United States) and Craig Campbell, Director of Risk Management and Claims for ATS Logistics.  The Court determines that Codan's action is not barred by limitations.[16]

By Letter dated August 2, 2005, Orr informed ATS Logistics that it was liable for the damage to the nacelle "AS PER SURVEY LOSS INCURRED" ... and that "We await settlement."  Ex. 37.  By Letter dated August 15, 2005, Campbell responded to Orr's notice of claim letter, "acknowledg[ing] receipt of [Orr's] correspondence dated 8/2/05" and stating that "Since Bay Machinery was the company who picked up the cargo of [sic] the port and was in control of it when the accident happened, we believe they are the proper person to make a claim to."  Ex. 37.  Campbell testified that he earlier told Orr in a telephone conversation after receiving Orr's notice of claim letter that "we were not the party to where the claim is to be made to, that Lancer was the insurer for Bay Machinery and that I did not anticipate paying on

---

[16] The contention by ATS Logistics that Codan's action is barred by limitations was not addressed or even mentioned in the extensive summary judgment proceedings prior to trial.  In its Answer to Codan's Complaint in Case No. 4:09cv00246, ATS Logistics only stated that "[s]till denying standing, jurisdiction, venue, or the existence of any applicable contract (or breach thereof by this defendant), [defendant] states that the plaintiff's claim would be barred in whole or part by the applicable statute of limitations, by limitations on liability, by the statute of frauds, and/or by the doctrines of failure to mitigate damages, laches, and waiver."  Answer at ¶ 16 [doc.#5].  As it was not argued or raised by the parties, the Court will not at this time address whether this statute of limitations affirmative defense was adequately pled in light of the United States Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, — U.S. —, 129 S.Ct. 1937 (2009).  *Cf. E.E.O.C. v. Hibbing Taconite Co.*, 266 F.R.D. 260, 267-68 (D.Minn. 2009) (noting that the developing trend in the courts is to require a defendant to plead an adequate factual basis for an affirmative defense where the basis is not apparent from the defendant's bare assertion; affirmative defenses are held to the same pleadings standards as apply to claims and counterclaims), and *Tracy v. NVR, Inc.*, No. 04-cv-6541L, 2009 WL 3153150, at *7 (W.D.N.Y. Sept. 30, 2009) ("[T]he *Twombly* plausibility standard applies with equal force to a motion to strike an affirmative defense under Rule 12(f)," and therefore, "defenses which amount to nothing more than mere conclusions of law and are not warranted by any asserted facts have no efficacy"), with *United States ex rel. Rille v. Sun Microsystems, Inc.*, No. 4:04cv00986-WRW, 2008 WL 4756170, at *6 (E.D.Ark. Oct. 28, 2008) (concluding that plaintiff cannot expect to know the quality or dimensions of the affirmative defenses, only that those defenses "are in play," although it should be noted that the court did not discuss any application of *Twombly* and relied on pre-*Twombly* precedent in reaching its conclusion).

21

behalf of ATS Logistics," although he also testified that he told Orr that "my position was, that ATS Logistics was a broker and that we would not be honoring his claim on that behalf and that I was declining his claim on that behalf."  Campbell thereafter drafted and sent his response to Orr's notice of claim letter stating that he "believe[s]" the claim should be made to Bay Machinery.

The relevant statutory provision is found at 49 U.S.C. § 14706(e)(1) and provides as follows:

(e) Minimum period for filing claims.—

(1) In general.—A carrier may not provide by rule, contract, or otherwise, a period of less than 9 months for filing a claim against it under this section and a period of less than 2 years for bringing a civil action against it under this section. The period for bringing a civil action is computed from the date the carrier gives a person written notice that the carrier has disallowed any part of the claim specified in the notice.

This provision is not a statute of limitations (as ATS Logistics asserted as an affirmative defense in its Answer to Codan's Complaint) but merely restricts the freedom of carriers to fix the period within which suit can be brought and prohibits contracts for any shorter period than the one specified.  *M.I.S. Engineering, Div. of Research and Development Corp. v. U.S. Express Enterprises, Inc.*, 438 F.Supp.2d 1056, 1061 (D.Neb. 2006).  In the absence of a valid contractual provision limiting the time for the shipper to file suit against a carrier, federal courts will borrow the forum state's most analogous statute of limitations laws to apply to Carmack Amendment claims.  *Id*. at 1061-62.[17]

---

[17] Because the nature of the carrier's duty under the Carmack Amendment sounds in negligence, the most analogous cause of action to the Carmack Amendment claim in this action is negligence, *cf. M.I.S. Eng'g*, 438 F.Supp.2d at 1062-63 (applying Nebraska limitations period for negligence to freight damage claim under Carmack Amendment), which under Arkansas law has a three-year statute of limitations.  Ark. Code. Ann. § 16-56-105.

Although the Carmack Amendment does not provide an applicable limitations period, it does establish when a claim accrues, *Daybreak Express, Inc. v. Legington Ins. Co.*, — S.W.3d —, 2011 WL 81301, at *6 (Tex.App.-Hous. (14 Dist.) Jan. 11, 2011), providing that "'[t]he period for bringing a civil action is computed from the date the carrier gives a person written notice that the carrier has disallowed any part of the claim specified in the notice.'" *Id*. (quoting § 14706(e)(1)). *See also M.I.S. Eng'g*, 438 F.Supp.2d at 1065 (applying § 14706(e)(1) to determine the date on which the plaintiff's Carmack Amendment claim accrued).

There is no dispute that Orr's notice of claim letter to Campbell at ATS Logistics constituted a timely and valid claim.  Campbell's response, however, does not constitute a "written notice that the carrier has disallowed any part of the claim specified in the notice" of the type required under 49 U.S.C. § 14706(e)(1).  In order to effectively commence the period of limitations, a carrier's notice of disallowance must be clear, final, and unequivocal.  *Combustion Engineering, Inc. v. Consolidated Rail Corp.*, 741 F.2d 533, 536 (2nd Cir. 1984).  Campbell's response simply attempts to point Orr in the direction of Bay Machinery without any words of disallowance whatsoever, stating instead only that we "believe" the claim should be made to Bay Machinery.  ATS Logistics does not offer any other evidence that disallowance was given to anyone, and Campbell's letter does not qualify as a clear, final, and unequivocal disallowance. *Cf. Security Ins. of Hartford v. Old Dominion Freight Line, Inc.*, No. 02 Civ 5258(GEL), 2003 WL 22004895, at *9-10 (S.D.N.Y. Aug. 22, 2003) (carrier's letter to shipper was susceptible of interpretation that claim was being passed on to the subcontractor but did not definitively reject the claim so as to operate as a clear, final and unequivocal disallowance of claim and, thus, was

insufficient to trigger limitations period), *rev'd on other grounds*, 391 F.3d 77 (2ⁿᵈ Cir. 2004).[18]

Accordingly, Codan's action is not barred by limitations.[19]

C.

Having determined that it is the Carmack Amendment that applies to the inland carriage

of the nacelle from the Port of Beaumont to Illinois and that Codan's action is not barred by

limitations, the Court now addresses the status of ATS Logistics under the Carmack

Amendment, namely whether ATS Logistics was acting as a "carrier" or a "broker."[20]

1.

A "carrier [or freight forwarder] providing transportation" is liable for actual loss to

property while in transit. *Panalpina*, 2010 WL 3894105, at *4 (quoting 49 U.S.C. § 14706)).

Accordingly, liability under the Carmack Amendment attaches only if the defendant was a

"carrier" or "freight forwarder"; "brokers" are not liable. *Id.* A "carrier" refers to a "motor

carrier" or a "freight forwarder." *Id.* (quoting 49 U.S.C. § 13102(3)). A "motor carrier" is "a

person providing motor vehicle transportation for compensation." *Id.* (quoting 49 U.S.C. §

13102(14)). A "freight forwarder" is "a person holding itself out to the general public ... to

provide transportation of property for compensation and in the ordinary course of its business"

meets the following three requirements: (1) assembles and consolidates shipments, (2) assumes

---

[18] In reversing the district court on other grounds, the Second Circuit stated that it agreed with the district court's timeliness ruling "substantially for the reasons stated" by the district court. 391 F.3d at 79.

[19] Campbell's testimony that he earlier told Orr that he "did not anticipate paying on behalf of ATS Logistics" while also telling him that he "was declining his claim" does not constitute written notice that the carrier has disallowed the claim and in any case is equivocal and superseded by his August 15ᵗʰ letter to Orr.

[20] There is no dispute that Bay Machinery was acting as a carrier under the Carmack Amendment. As previously noted, the subcontract between ATS Logistics and Bay Machinery required *inter alia* that Bay Machinery "assume the liability required of an interstate motor common carrier under 49 U.S.C. § 14706 [the Carmack Amendment] ..." and that such liability be for "'full actual loss'" of the goods. Ex. 2, ATS Logistics-Bay Machinery Subcontract, Clause 7.

24

responsibility for transporting the goods from receipt to the final destination, and (3) uses as part of the transportation process a carrier as defined by the Act. *Id*. (quoting 49 U.S.C. § 13102(8)). "Transportation" under the Interstate Commerce Act refers to "services related to that movement including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property." *Id*. (quoting 49 U.S.C. § 13102(23)). Finally, a "broker" is "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." *Id*. (quoting 49 U.S.C. § 13102(2)). The implementing regulation provides additional guidance: a motor carrier is not a broker "when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport." *Id*. (quoting 49 C.F.R. § 371.2(a)). *See also CGU Intern. PLC. v. Keystone Lines, Corp.*, No. C-02-3751 SC, 2004 WL 1047982, at *2 (N.D. Cal. May 5, 2004) ("The difference between a carrier and a broker is often blurry. The crucial distinction is whether the party legally binds itself to transport, in which case it is considered a carrier.") (citing 49 C.F.R. § 371.2(a)). Thus, if ATS Logistics accepted responsibility for ensuring delivery of the goods, regardless of who actually transported them, then ATS Logistics qualifies as a carrier. *See id.* If, however, ATS Logistics merely agreed to locate and hire a third party to transport the nacelle, then it was acting as a broker. *Id*.

ATS Logistics's status as a "carrier" or "broker" of the damaged nacelle focuses on the nature of the relationship between ATS Logistics and Vestas, not on the label put on ATS

Logistics's services.  *Panalpina*, 2010 WL 3894105, at *5.  *See also Lumbermens Mut. Cas. Co. v. GES Exposition Servs., Inc.,* 303 F.Supp.2d 920, 921 (N.D.Ill.2003) ("carrier" or "broker" analysis governed by how defendant "holds itself out to the world and its relationship to the shipper").  Thus, the inquiry into ATS Logistics's business relationship with Vestas includes factual considerations such as how ATS Logistics holds itself out to the public and whether ATS Logistics assumed responsibility to deliver the nacelle.  *Panalpina*, 2010 WL 3894105, at *5.

2.

ATS Logistics states that it does not operate a single truck or employ a single driver and that its website clearly illustrates that it is a broker, a fact made clear in the ATS Logistics-Bay Machinery subcontract.  ATS Logistics states that it was Vestas that chose the "carrier" label in the various Carriage Contracts, and that with respect to the 192 Crescent Ridge Project shipments it had made at the time of the accident at issue, ATS Logistics arranged for a carrier to transport every single shipment; ATS Logistics did not pick up a single load for Vestas.  ATS Logistics argues that it has established its role as a "broker" through its consistent conduct in arranging for transport of each wind turbine component and that it held itself out to be a "broker" to the public and to Vestas in both its advertising and business dealings.

The Court finds that the agreement under which Vestas and ATS/ATS Logistics were operating with respect to the Cresent Ridge Project establishes ATS Logistics's status as a "carrier" under the Carmack Amendment.  First, the September 24, 2004 "Notice of Contract Award for the Crescent Ridge Project" Vestas sent to ATS/ATS Logistics informs ATS/ATS Logistics that it was being awarded the "*transportation*" contract of the Crescent Ridge Project and that "[t]his agreement is for the *transportation* and logistics coordination of . . . wind turbine

components" for which ATS/ATS Logistics is to "provide *transportation service* for all components ... of the wind turbines from port to pad, as well as logistics coordination at all load out points as well as at the site location."  Ex. 9, Notice of Contract Award for the Crescent Ridge Project (emphasis added).  The description of the contract awarded to ATS/ATS Logistics is that of a "transportation" contract and is consistent with Redding's, Finnvik's, and Netland's conflating of the companies comprising the ATS Organization and their representations concerning the services they would provide.  Indeed, the versions of the Carriage Contracts signed by ATS Logistics (Ex.'s 14, 26) are persuasive evidence of ATS Logistics holding itself out as a "carrier," offering "carrier" services, and binding itself to remain responsible as "carrier" notwithstanding any subcontract of the transportation of Vestas's shipments between ATS Logistics and Bay Machinery.  In this respect, the preamble of the Second Carriage Contract provides in part as follows: "Vestas-American Wind Technology, Inc. ("Vestas-American") desires ATS Logistics Services (hereinafter "Carrier") to furnish motor carrier services to Vestas-American covering the carriage of Wind Turbine Generator components (stated as WTG from hereon), and Carrier desires to provide such services to Vestas-American."  Ex. 14.  ATS Logistics is described for all contract purposes as "carrier," not "broker," and the services which Vestas states it desired of ATS, and which ATS Logistics obviously desired to provide to Vestas as stated in the Second Carriage Contract it signed, are "motor carrier services" to Vestas covering the carriage of Vestas wind turbine components; there is no term, section or subsection in the Second or Revised Carriage Contract in which ATS Logistics is described or referred to as other than "carrier."  For example, Clause 1 of the Second Carriage Contract, entitled "Carrier Services," provides in part as follows:

> 1.1 Carrier agrees to transport each WTG Component . . . from the manufacturer's Loading Site(s) and the Port of arrival named therein to the Delivery Site(s) named therein.

Ex. 14, Second Carriage Contract, Clause 1.1

Similarly, Clause 2 of the Second Carriage Contract, entitled "Carrier Equipment," provides:

> 2.1 Carrier shall furnish tractors and trailers ("Vehicle or Vehicles") and all other equipment ("Equipment") necessary for the proper and safe securing and transport of the WTG Components, including but not limited to chains, chocks, cradles, braces, dunnage and straps . . .
>
> 2.2 Carrier represents and warrants that it has the capability to perform all of its obligations under this Agreement and further represents and warrants that it will have sufficient Vehicles and Equipment available to perform its obligations under this Agreement in a timely manner.

Ex. 14, Second Carriage Contract, Clause 2.  The remainder of Exhibit 14 is consistent with the above examples.

Netland acknowledges that the Second Carriage Contract he signed says "carrier" but he testified that he is "viewing this as a broker" when he reads it and that "if you look at it that way, that's what I'm doing."  The Court gives little weight to this testimony given the manner in which Redding, Finnvik, and Netland conflated the companies comprising the ATS Organization and essentially represented to Vestas that "ATS" could provide full "turnkey" transportation services for the carriage of wind turbine components to the Crescent Ridge Project.  Although the Second Carriage Contract signed by ATS Logistics was not formally accepted or entered into by Vestas and the Revised Carriage Contract post-dates the accident and is not applicable, these Carriage Contracts make clear that the services contemplated and offered by ATS Logistics comprise cargo carriage and transport, not brokerage.  ATS Logistics committed to furnishing

the vehicles and equipment necessary to physically carry the cargo, a commitment that far exceeds an agreement to act as a mere middleman or broker with respect to Vestas's wind turbine components.

It is true that ATS Logistics described itself as a "broker" in its subcontract with Bay Machinery.  Vestas, however, was not a party to the ATS Logistics-Bay Machinery subcontract, and is not bound by that subcontract.  Moreover, in proposing modifications to the Carriage Contract terms, ATS Logistics referred to itself as "carrier," and not as broker, in its correspondence with Vestas.  *See* Ex. 13, November 16, 2004 e-mail message from Redding to Harris proposing a limitation of liability for cargo loss or damage.  There is nothing in the record showing that ATS Logistics proposed or requested that references to itself in the Carriage Contract be changed to "broker" or anything other than "carrier," and, as demonstrated by the Second Carriage Contract, ATS Logistics clearly intended to retain full responsibility for all of its obligations both as "carrier" and "In any event" and "notwithstanding any subcontract."  Ex. 14, Second Carriage Contract, and Ex. 26, Revised Carriage Contract, both at Clause 19.

### D.

Having determined that ATS Logistics was acting as a "carrier" under the Carmack Amendment (as was Bay Machinery), the Court now turns to the issue of whether Codan has established a *prima facie* case of liability for damage to the nacelle.  In order to establish a *prima facie* case of liability under the Carmack Amendment, a plaintiff must prove three things: (1) delivery of the goods in question to the carrier in good condition; (2) arrival in damaged condition; and (3) the amount of damages caused by the loss.  *Custom Rubber*, 633 F.Supp.2d at 509.  The Carmack Amendment is comprehensive enough to embrace all damages resulting from

any failure to discharge a carrier's duty with respect to any part of the transportation to the agreed destination. *American Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Systems, Inc.,* 325 F.3d 924, 931 (7th Cir. 2003) (internal quotation marks and citations omitted). Recoverable damages include damages for delay, lost profits (unless they are speculative), and all reasonably foreseeable consequential damages. *Id.* "Within the meaning of the Carmack Amendment, actual loss or injury to the property is ordinarily measured by the reduction in market value at destination or by replacement or repair costs occasioned by the harm." *Camar Corp. v. Preston Trucking Co., Inc.,* 221 F.3d 271, 277 (1st Cir. 2000) (internal citations and quotations omitted). Once a plaintiff establishes a *prima facie* case, the carrier will be liable unless it can establish that it was free from negligence and that the damage was caused solely by: (a) the act of God, (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods. *Custom Rubber*, 633 F.Supp.2d at 509.

There is no dispute that the nacelle was received by Bay Machinery in apparent good and undamaged condition as reflected by the "Transport Control Form" signed by Kerton on November 19, 2004. *Cf. Mach Mold Inc. v. Clover Associates, Inc.,* 383 F.Supp.2d 1015, 1030 (N.D.Ill. 2005) (order form was analogous to bill of lading and it was reasonable to determine that goods were received by carrier in good condition where driver signed order form as acknowledgment that goods had been "[r]eceived in apparent good order" and noted no exception to that condition on the form); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2nd Cir. 2004) ("a shipper's burden of proving that the goods were delivered to the carrier in good condition may be satisfied by the proffer of a clean bill of lading for the shipment, provided that the cargo was packaged in a way that permitted its inspection by

30

the carrier.").  There is also no dispute that the nacelle was secured by Kerton onto his trailer at the Port of Beaumont and that the nacelle was thereafter damaged in a road accident in Arkansas on November 21, 2004, while in Bay Machinery's exclusive care, custody and control.

Bay Machinery argues that the evidence establishes, at most, that the nacelle appeared superficially in good condition, but it does not in any way establish that the nacelle was operable or in good condition in its interior components.  Bay Machinery also argues there is evidence from which one could conclude that the nacelle was loaded quickly and improperly by the crew at the Port of Beaumont, causing it to shift or move on the trailer, leading to the accident.  The Court disagrees.

Kerton accepted receipt of the nacelle in "good condition" and the evidence at trial established that the damage to the nacelle incurred in the accident at issue was fully consistent with damage that would be sustained from falling off a trailer at highway speed.  This is not a situation in which Codan was required to present additional evidence in order to establish the initial contents and condition of the nacelle.  *See, e.g., Travelers Indem. Co. of Connecticut v. Central Transport, Inc*., Civil Case No. 2:07-CV-14096, 2008 WL 4793403, at *5-7 (E.D.Mich. Nov. 03, 2008) (noting that when the shipment is sealed, plaintiff must present additional evidence in order to establish the initial contents and condition of the cargo).  Kerton also acknowledged he was responsible for properly securing the load onto his trailer, even if he thought the loading of the nacelle onto his trailer by the crew at the Port of Beaumont "wasn't perfect, but it was on there."  *See United States v. Savage Truck Line, Inc.*, 209 F.2d 442, 445 (4th Cir. 1954) ("if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper"); *Vargo-Schaper v. Weyerhaeuser Co.*, 619 F.3d 845, 848-49 (8th Cir.

2010) (same).  There simply is no evidence in the record demonstrating that Bay Machinery was free from negligence and that the damage to the nacelle was caused solely by the act of God, the public enemy, the act of the shipper himself, the public authority, or the inherent vice or nature of the goods.  *Cf. Custom Rubber,* 633 F.Supp.2d at 510 (holding there was no affirmative evidence a loading defect caused the trailer to tip because there were numerous possibilities that could have caused the accident, such as taking a turn too fast).  Nor is there evidence that the nacelle suffered additional damage from the manner in which it was retrieved from the accident site and transported to a warehouse in Memphis, Tennessee (where it sat for several months with accruing storage fees) or during its return to Denmark by ship (with cost) for survey of the extent of the damage to the nacelle.  Indeed, the conduct of the parties involved in the post-accident handling of the nacelle – including the crane crew at the accident site, Naesborg, Prata, and Captain Petersen – was completely reasonable in the circumstances and, far from increasing damages, actually served to minimize damage, including by the recycling of parts.  Given that the nacelle was in apparent good and undamaged condition upon its receipt by Bay Machinery, that the nacelle was secured onto the Bay Machinery trailer by Kerton, and that the nacelle thereafter fell off the trailer while going around a curve at 50-55 miles per hour, the Court finds that Codan has established a *prima facie* case of full liability under the Carmack Amendment for damage to the nacelle.  Accordingly, damages in the amount of $606,917.30 – the total amount Codan paid to Vestas pursuant to its contract of insurance – have been proven.

### E.

The Court now turns to whether ATS Logistics is entitled to a limitation of its liability for damage to the nacelle because the Second Carriage Contract (signed only by ATS Logistics) and

the November 16, 2004 e-mail from Redding to Harris both included a limitation of liability of $100,000.

The Carmack Amendment provides a general rule that motor carriers transporting property are liable to shippers "for the actual loss or injury to the property" caused by the carrier, 49 U.S.C. § 14706(a)(1), but allows for an exception under which a shipper may "establish rates for the transportation of property ... under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation." 49 U.S.C. § 14706(c)(1)(A).  The carrier bears the burden of proving that it has limited its liability by agreement or contract with a shipper. *Custom Rubber,* 633 F.Supp.2d at 510-11; *Nipponkoa Ins. Co., Ltd. v. Towne Air Freight, LLC*, No. 4:08-CV-976 CAS, 2009 WL 3257868, at *5 (E.D.Mo. Oct. 07, 2009).  To limit its liability under the Carmack Amendment, a carrier must (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission (now the Surface Transportation Board); (2) give the shipper a reasonable opportunity to choose between two or more levels of liability; (3) obtain the shipper's agreement as to the choice of liability; and (4) issue a receipt or bill of lading prior to moving the shipment.  *Werner Enterprises, Inc. v. Westwind Maritime Intern., Inc.*, 554 F.3d 1319, 1326 (11th Cir. 2009).

The Court finds that ATS Logistics cannot sustain any of the latter three elements required to limit its liability for the damage to the nacelle.  First, in order to comply with the requirement that the carrier give the shipper a fair opportunity to choose between two or more levels of liability, a carrier must provide the shipper with both reasonable notice of any options

33

that would limit the liability of the carrier and the opportunity to obtain the information about those options that will enable the shipper to make a deliberate and well-informed choice. *Custom Rubber*, 633 F.Supp.2d at 511 (internal quotation marks and citation omitted).  Vestas denies, and there is no evidence to the contrary, that it ever received the Second Carriage Contract containing the $100,000 limitation of liability, and ATS Logistics's proposed $100,000 limitation of liability as set forth in Redding's November 16, 2004 e-mail to Harris did not give Vestas a choice of at least two levels of carrier liability in the three days prior to Kerton loading the nacelle onto Bay Machinery's trailer, providing instead that ATS Logistics's liability for damage to Vestas's cargo would be limited to $100,000 "In any event."  *Cf. Werner Enterprises*, 554 F.3d at 1327 (carrier gave shipper of goods or its agent the required reasonable opportunity to choose between two or more levels of liability where the broker transportation agreement (BTA) executed by carrier and shipper's agent – a valid written contract – incorporated carrier's tariff, which limited carrier's liability to $200,000 per truckload unless agent selected higher liability, and the BTA gave shipper the opportunity to elect full liability coverage by completing steps listed in specified item of tariff, paying an increased freight rate, and obtaining carrier's authorization in writing, even though shipper's agent chose not to increase the liability for this or any of its shipments on behalf of shipper).

　　As to whether ATS Logistics obtained an agreement from Vestas to limit its liability for damage to the cargo, there is, as previously noted, nothing in the record evidencing an agreement affording Vestas a reasonable opportunity to choose between two or more levels of liability and ATS Logistics thus has not sufficiently demonstrated a written agreement to limitation of its liability which pre-dates the nacelle accident and which is signed by or on behalf of Vestas.  *See*

*Kellaway Intermodal & Dist. Systems, Inc. v. The Gillette Co.*, 578 F.Supp.2d 304, 311 (D.Mass. 2008) ("If there is nothing in the record 'evidenc[ing] an agreement affording [the shipper] a reasonable opportunity to choose between a regular rate and a rate reflecting a higher level of liability' ... then [carrier] has not sufficiently demonstrated an agreement to limit liability.") (quoting *Preston Trucking*, 221 F.3d at 276)).

ATS Logistics, however, argues that Vestas accepted the limitation of liability terms through its conduct and should be estopped from denying the limitation of liability.  In this respect, ATS Logistics notes that the November 16, 2004 e-mail from Redding to Harris laying out the proposed limited liability terms concludes by stating, "I am hopeful that this format will meet with your approval."  Ex. 13.  ATS Logistics argues Vestas accepted this offer through its conduct, namely by releasing the nacelle to Bay Machinery with no objection after receiving the Second Carriage Contract signed by ATS Logistics and the November 16, 2004 e-mail.  *Cf. MidAmerican Energy Co. v. Start Enterprises, Inc.*, 534 F.Supp.2d 930, 936-37 (S.D.Iowa 2008) (a shipper can choose to limit a carrier's liability without signing a bill of lading, for instance, when receipt of the writing by the shipper and his action upon it are adequate proof that he has assented to its terms and has made it the written agreement of the shipper and carrier; thus, when a writing that is the basis of the agreement limiting liability is assented to by conduct, the conduct, if unambiguous, will serve the same function as a signature) (internal quotation marks and citations omitted).

ATS Logistics has not established that Vestas ever received the Second Carriage Contract with its limitation of liability prior to the accident at issue or that Vestas's conduct with regard to the carriage of wind turbine components to the Crescent Ridge Project was any different

35

following Redding's November 16, 2004 e-mail to Harris proposing a limitation of liability than it was before.  Vestas states it had no knowledge of the subcontract between ATS Logistics and Bay Machinery and Redding's e-mail did not in these circumstances bind Vestas to a limitation of liability simply because Vestas continued its arrangement with ATS/ATS Logistics in the same manner.  There simply is no evidence that Vestas, through its "unambiguous" conduct, accepted ATS/ATS Logistics's proposed limitation of liability,  *MidAmerican Energy*, 534 F.Supp.2d at 936-37, or that Vestas otherwise stood silently by and allowed ATS/ATS Logistics to believe that it had no objection to the proposed limitation of liability and should therefore be estopped.  *Cf. Shakey's, Inc. v. Caple*, 855 F.Supp. 1035, 1043-44 (E.D.Ark. 1994) (landlord was estopped from asserting sublease entered into by tenant as grounds for terminating lease agreement where landlord never acted on letter sent by tenant and his attorney seeking approval of sublease, did not take any act indicating intent to enforce forfeiture, and instead demanded that tenant make repairs to property or be in default under terms of lease agreement).

Finally, ATS Logistics's limitation argument fails because neither ATS Logistics nor its subcontractor, Bay Machinery, issued a receipt or bill of lading covering the shipment of the nacelle.  ATS Logistics therefore cannot satisfy the final proof requirement for avoiding full-value liability under the Carmack Amendment.  *See MidAmerican Energy*, 534 F.Supp.2d at 935-36 (to limit liability under the Carmack Amendment, the fourth prong requires the carrier to prove that it issued a receipt or bill of lading that reflects the agreement between the two parties to limit liability).

F.

To this point it is clear that because Vestas and ATS/ATS Logistics were not operating

36

pursuant to a formal written agreement that expressly waived any Carmack Amendment rights or remedies at the time of the accident on November 21, 2004, the Carmack Amendment provides the governing law between Vestas and ATS/ATS Logistics.  *See* Chused, *The Evolution of Motor Carrier Liability under the Carmack Amendment into the 21st Century*, 36 Transp. L.J. at 226 (if, under 49 U.S.C. § 14101(b), a shipper/carrier contract does not expressly waive, in writing, the provisions of the Carmack Amendment, then the full force and effect of that statute continue to apply); *Celadon Trucking Services, Inc. v. Titan Textile Co., Inc.*, 130 S.W.3d 301, 305 (Tex.App. - Houston [14 Dist.], 2004) (under the plain meaning of 49 U.S.C. § 14101(b)(1), for a waiver to be effective, the agreement between the shipper and the carrier must communicate clearly and unmistakably or directly state that the rights or remedies in question are waived). ATS Logistics and Bay Machinery, however, were operating pursuant to written agreements with each other, both by virtue of their subcontract and their Load Confirmation & Rate Agreement.  It is the contractual relationship between ATS Logistics and Bay Machinery and the extent of their liability to one another to which the Court now turns.

The Carmack Amendment governs the liability of carriers to the original shipper, here the liability of ATS Logistics and Bay Machinery to Vestas.  This liability of the two carriers ordinarily is joint and several as the Carmack Amendment makes the two carriers each fully liable.  *See Rankin v. Allstate Ins. Co.*, 336 F.3d 8, 17 (1st Cir. 2003), citing *Pizzo v. Bekin Van Lines Co.*, 258 F.3d 629, 634 (7th Cir. 2001) ("Pizzo was free to sue the carrier that issued the bill of lading as well as the carrier that delivered the goods, 49 U.S.C. § 14706(a)(1), and these carriers would be jointly as well as severally liable to her unless they could show that they were not to blame.").  The situation is different, however, regarding the liability of two carriers *inter*

*sese* (*i.e.*, the liability of ATS Logistics and Bay Machinery to one another). *Project Hope v. M/V IBN SINA*, 250 F.3d 67, 75 n.7 (2nd Cir. 2001). "The issuer of the bill of lading and the delivering carrier are *prima facie* liable even though the goods may have been damaged by intermediate carriers; it's up to the defendants to put the finger on the guilty carrier." *Pizzo*, 258 F.3d at 634 (citation omitted).[21]

## 1.

Bay Machinery argues it is entitled to a limitation of its liability for damage to the nacelle on grounds that it was to be given notice of the need for additional insurance in the event the value of the shipment exceeded $100,000 and no such notice was given. The Court disagrees that such notice was required under the subcontract between ATS Logistics and Bay Machinery but does agree that the Load Confirmation & Rate Agreement between ATS Logistics and Bay Machinery required that notice of the need for additional insurance be given in the event the value of the shipment exceeded $100,000.

## i.

Bay Machinery notes that Clause 6 of its subcontract with ATS Logistics required that Bay Machinery carry all-risk liability insurance coverage with minimum limit of the insurer's liability of $100,000 or the declared value of a shipment, whichever is greater, and argues that this Clause contemplated that Kerton would be notified by ATS Logistics if the value of the particular load he was carrying exceeded $100,000. Bay Machinery's construction of Clause 6 is questionable, however, given that Bay Machinery's subcontract with ATS Logistics also

---

[21] Ordinary rules of the applicable state's negligence law govern actions to determine which of two carriers is liable to the other. *Project Hope*, 250 F.3d at 75 n.7 (internal quotations marks and citation omitted). Where a fair allocation of liability cannot be made among multiple tortfeasors, the federal common law permits imposition of joint and several liability. *Id.* at 76.

required that Bay Machinery "assume the liability required of an interstate motor common carrier under 49 U.S.C. 14706 . . . for 'Full actual loss.'"  Ex. 2, ATS Logistics-Bay Machinery Subcontract, Clause 7.  This language is at odds with the contention that Clause 6 of Bay Machinery's subcontract with ATS Logistics provided any limit of Bay Machinery's liability for cargo damage.[22]

ii.

The Court does, however, find that Bay Machinery is entitled to a limitation of liability of $100,000 pursuant to the Load Confirmation & Rate Agreement signed by Cari Woitalla of ATS Logistics and Kerton of Bay Machinery and by virtue of which the nacelle load was assigned to Bay Machinery.  Ex. 21.  This Load Confirmation & Rate Agreement, which is dated November 11, 2004, apparently post-dates the ATS Logistics-Bay Machinery subcontract and is more specific in its terms, thus superceding that subcontract as concerns the question of insurance coverage and limitation of liability applying to the nacelle load at issue.  Importantly, the Load Confirmation & Rate Agreement provides that "A minimum of $100,000 cargo insurance is required unless otherwise noted."  It is undisputed that the standard in the trucking business at the time was for cargo insurance coverage of $100,000, and Kerton's uncontroverted testimony was that if the particular load is more valuable than the standard insurance coverage, it is routine and usually required for him to obtain supplemental cargo insurance.  Indeed, Harris testified that the standard cargo insurance coverage of $100,000 did not apply to the "specialized and highly valuable loads" destined for the Crescent Ridge Project "[b]ecause of the nature of

---

[22] Clause 6 does not address, and has no effect upon, Bay Machinery's legal liability to cargo owners such as Vestas for loss or damage of cargo while in Bay Machinery's custody and does not impose on Vestas an obligation to notify Bay Machinery in the event that the value of a shipment transported by Bay Machinery exceeds $100,000.  As previously noted, Vestas claims, and it has not been demonstrated otherwise, that it had no knowledge of ATS Logistics's subcontract with Bay Machinery.

the specialized transportation and the value of the cargo coupled with the potential for liquidated

damages" if the project components were not delivered on schedule.  No notice of the need for

additional insurance coverage was given to Bay Machinery, however, and Kerton, noting that he

"had $100,000 and ... $100,000 supplemental," testified that he took the nacelle load "thinking

that [cargo insurance coverage of $100,000] was the correct amount of insurance for this load."[23]

Because ATS Logistics (which, as will be explained shortly, was acting as an agent for Vestas)

agreed and represented to Kerton in the Load Confirmation & Rate Agreement that only

$100,000 in cargo insurance – the standard at the time – would be required and no notice to the

contrary was given, Bay Machinery is entitled to a limitation of liability of $100,000 as to ATS

Logistics.

2.

There remains the question of the extent of Codan's recovery as between ATS Logistics

and Bay Machinery.  Although liability under the Carmack Amendment ordinarily is joint and

several, the Court determines in these circumstances that because ATS Logistics was acting as

Vestas's agent as a carrier with subcontracting authority to carry out its carrier duties, Bay

Machinery's limitation of liability as between it and ATS Logistics applies to Codan.

 "Agency is the relationship which results from the manifestation of consent by one

person to another that the other shall act on his behalf and subject to his control, and consent by

the other so to act."  Richard A. Lord, 12 *Williston on Contracts* § 35:1 (4th ed. West 2010).

Under the federal common law of agency, an agent's authority may be actual or apparent.

---

[23] Shippers know or should know the nature and value of the goods they ship, that for the cheap freight rates they pay, they get commensurately low, limited motor carrier liability, and that if they want 'full value' cargo liability they must expect to pay commensurately higher freight rates.  Chused, *The Evolution of Motor Carrier Liability under the Carmack Amendment into the 21st Century*, 36 Transp. L.J. at 210.   "Motor carriers are not insurance companies, which is why shippers buy cargo insurance in the first place."  *Id*.

40

*Moriarty v. Glueckert Funeral Home Ltd.*, 155 F.3d 859, 865-66 (7th Cir. 1998) (citing Restatement (Second) of Agency)).  If it is actual, it may be express or implied.  *Id.* at 866. "Implied authority is that authority which is inherent in an agent's position and is, simply, actual authority proved through circumstantial evidence."  *Id.*  "Actual authority 'to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'" *Id.* (quoting Restatement (Second) of Agency)).[24]

The evidence at trial established that ATS Logistics had the authority to act for and on behalf of Vestas concerning the carriage of wind turbine components to the Crescent Ridge Project and that ATS Logistics was subject to Vestas's control.  Vestas claims it never received the Second Carriage Contract but it did enter into the Revised Carriage Contract and Clause 19 concerning subcontracting authority is identical in both Carriage Contracts, providing that the carrier can subcontract the performance of any of its obligations under the agreement. Moreover, Harris testified that she knew ATS/ATS Logistics would not haul every load itself.[25] The evidence thus shows that Vestas authorized ATS Logistics to employ the services of others

---

[24] It is not clear whether actions arising from the Carmack Amendment are governed by the federal common law of agency or by the state common law.  *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000); *Custom Cartage, Inc. v. Motorola, Inc.*, No. 98 C 5182, 1999 WL 965686 at *14 n.6 (N.D.Ill. Oct. 15, 1999).  The parties do not discuss this issue, including which particular state's law might apply, but there is no argument that general principles of the federal common law of agency would somehow differ and have a substantial effect on this action depending on whether state or federal law on agency applies.  The federal courts have relied on the Restatement of Agency as a valuable source for establishing the federal common law of agency, *see, e.g., Moriarty*, 155 F.3d at 865-66 n.15, and Arkansas generally relies on the definition of agency in the Restatement.  *See, e.g., Evans v. White*, 284 Ark. 376, 378, 682 S.W.2d 733, 734 (1985); *Frawley v. Nicklolich*, 73 Ark.App. 231, 235-36, 41 S.W.3d 420, 422 (2001).  Oregon, where Vestas and ATS/ATS Logistics apparently reached their agreement for the carriage of wind turbine components to the Crescent Ridge Project (and which the Carriage Contracts provide will be the governing law) likewise has relied on the definition of agency in the Restatement, *see, e.g., Vaughn v. First Transit, Inc.*, 346 Or. 128, 135-36, 206 P.3d 181, 186-87 (2009), as has Minnesota, the governing law for purposes of the ATS Logistics-Bay Machinery subcontract.  *See, e.g., Borglum v. Waseca Soil and Water Conservation Dist.*, No. A09-287, 2009 WL 5090021, at *5 (Minn.App. Dec. 29, 2009).

[25] Harris stated that ATS Logistics could do the job with their own equipment and in-house leased carriers, and that she would put Bay Machinery in the category of an in-house leased carrier rather than as a brokered load, which she stated to be for a specific load.

in carrying out its carrier duties with respect to the carriage of wind turbine components to the Crescent Ridge Project or at least was aware that ATS Logistics might do so, even if Vestas had no specific knowledge of ATS Logistics's subcontract with Bay Machinery.

In addition, the conduct of Vestas and ATS Logistics establishes that ATS Logistics was acting pursuant to Vestas's control and not merely as an independent contractor, *i.e.*, "one who, exercising an independent employment, contracts to do work according to his own methods and without being subject to the control of the employer, except as to the results of the work." *Taylor v. Gill*, 326 Ark. 1040, 1045-56, 934 S.W.2d 919, 923 (1996) (quoting *Howard v. Dallas Morning News, Inc.*, 324 Ark. 91, 100, 918 S.W.2d 178, 183 (1996)).  In this respect, the evidence shows that Vestas directed, or could have directed, how ATS Logistics carried out the carriage of Vestas's wind turbine components.  The various versions of the Carriage Contracts certainly provided such authority and Engel stated that her understanding from Harris was "that there was no brokering of our loads allowed ... to give Vestas more control over the movement of loads and to lessen loss."  Harris likewise testified that there were discussions concerning ATS's equipment and capabilities and how delivery times are very important, the reason being that there are very expensive cranes and crews waiting on each end to load and unload trucks and erect the wind turbines.  Harris noted that Engel was to be securing proper equipment and the proper quantity of equipment and making sure the drivers were going to sign on for a certain quantity of loads and that this had everything to do with making sure ATS followed up on their commitments.

In sum, the record demonstrates, and the Court so finds, that ATS Logistics was acting as an agent for Vestas, and Vestas therefore is subject to the limitation of liability between ATS

42

Logistics and Bay Machinery.  *Cf. Custom Cartage, Inc. v. Motorola, Inc.*, No. 98 C 5182, 1999 WL 965686, at *16 (N.D.Ill. Oct. 15, 1999) (if carrier hired by shipper to transport goods was acting as shipper's agent, carrier could have limited the liability of subcontractor it hired to haul the goods to shipper).   Accordingly, while Codan may seek full recovery from ATS logistics which, as previously explained, is not entitled to any limitation of liability, Codan is entitled to no more than $100,000 recovery from Bay Machinery based on Bay Machinery's limitation of liability between it and ATS Logistics.

## G.

Codan is additionally entitled to prejudgment interest, which in this case is computed from the date Codan paid Vestas's claim.  *See Yellow Freight*, 325 F.3d at 935-37.  Computation of an award of prejudgment interest on this record is somewhat complicated, however, given that, according to Naesborg, Codan paid Vestas DKK 3,000,000 on May 31, 2006, and paid Vestas an additional amount on November 1, 2006.  Thus, Codan is entitled to prejudgment interest on two amounts paid on two different dates.  An additional complicating factor is the proper conversion rate between the Danish Krone and the U.S. Dollar.  Because these matters are not adequately addressed on this record, the Court hereby gives the parties twenty (20) days from the date of entry of this Memorandum and Order in which to submit to the Court an agreed amount of prejudgment interest to which Codan is entitled based on the findings of fact and conclusions of law as herein set forth (subject, of course, to appeal).  Should the parties be unable to agree on the amount of prejudgment interest, the Court hereby gives Codan twenty (20) days from the date of entry of this Memorandum and Order in which to file a motion for prejudgment interest that sets forth its basis for the amount of prejudgment interest claimed.

ATS Logistics and Bay Machinery may then respond to Codan's motion within the time set forth in this Court's Local Rules after which this Court will make a final determination of the amount of prejudgment interest to which Codan is entitled.

H.

One final matter concerns attorney's fees.  At the conclusion of the trial Codan announced that should it prevail it would seek attorney's fees pursuant to the Second and Revised Carriage Contracts, both of which provide that "[i]n any ... litigation to enforce the provisions of this Agreement, the prevailing party in such action shall be entitled to the recovery of its reasonable attorneys' fees and expenses...."  Ex. 14, Second Carriage Contract, Clause 28; Ex. 26, Revised Carriage Contract, Clause 28.  The Court has previously found, however, that the Second Carriage Contract was not formally accepted or entered into by Vestas, it thus not being a binding contract for purposes of this action, and that the Revised Carriage Contract post-dates the accident to the nacelle and also does not apply to this action (although both Carriage Contracts were considered as evidence of the parties' intent and dealings concerning the carriage of the wind turbine components to the Crescent Ridge Project).[26]  It thus is not clear how the Second and Revised Carriage Contracts provide a basis for an award of attorney's fees as neither was in legal effect for purposes of this action.

The Carmack Amendment, in turn, contains no provision allowing for the recovery of attorney's fees as an element of damages by a shipper of general freight, and claims for attorney's fees in a Carmack Amendment lawsuit based on state law generally have been held to

---

[26] Codan previously agreed that the Revised Carriage Contract "which, by its terms applied only to the transportation of wind turbine components in route or not yet loaded as of 12:00 noon CST on November 25, 2004, does not govern the rights and liabilities of the parties with respect to the November 21, 2004 damages to the nacelle."  Codan's St. of Undisp. Facts Pursuant to E.D. Ark. Local Rule 56.1 ¶ 45 (citing Ex. 26, Clause 15.3) [doc.#68].

be preempted, as with other forms of state and common law relief.  Chused, *The Evolution of Motor Carrier Liability under the Carmack Amendment into the 21st Century*, 36 Transp. L.J. at 190.  *See, e.g., Accura Systems, Inc. v. Watkins Motor Lines, Inc.,* 98 F.3d 874, 876 (5th Cir. 1996) ("attorney's fees authorized by state law are not available in Carmack Amendment actions."); *Royal Air, Inc. v. AAA Cooper Transp., Inc.*, 395 F.Supp.2d 436, 441 (W.D.La. 2005) ("Royal Air's claim for reasonable attorney's fees in the instant action fails, as the claim for attorney's fees is completely pre-empted by the Carmack Amendment.").  Rather, motor carriers are liable only for the actual value of the lost or damaged article or the cost of repairing it – damages that were foreseeable to the motor carrier when it received the shipment for transportation – with the objective of restoring the shipper to the position he would have been in. Chused, *The Evolution of Motor Carrier Liability under the Carmack Amendment into the 21st Century*, 36 Transp. L.J. at 190.

It thus appears that any claim of Codan for an award of attorney's fees, at least on the basis asserted at the conclusion of trial, is misplaced.   Nevertheless, the Court is not now ruling that Codan is not entitled to attorney's fees but will await any motion for attorney's fees from Codan prior to conclusively ruling on the matter.

III.

For the foregoing reasons, the Court finds in favor of Codan on its Carmack Amendment claims and awards Codan $606,917.30 in damages.  Codan may seek full damages from ATS Logistics but is limited to $100,000 in damages from Bay Machinery.[27]  The Court will defer

---

[27] Of course, should Codan seek damages from Bay Machinery in an amount not to exceed $100,000, ATS Logistics's obligation will be reduced accordingly.  In this respect, ATS Logistics may seek contribution from Bay Machinery in an amount not to exceed $100,000.

entering final judgment pending determination of the amount of prejudgment interest to which Codan is entitled as set forth above.

IT IS SO ORDERED this 16th day of February 2011.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE